IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THAI N.,[1]                              )
                                         )
            Plaintiff,                   )         No. 21 C 3330
                                         )
v.                                       )         Magistrate Judge Jeffrey Cole
                                         )
KILOLO KIJAKAZI,                         )
Acting Commissioner of Social Security,  )
                                         )
            Defendant.                   )

MEMORANDUM OPINION AND ORDER

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act,

42 U.S.C. §§416(I), 423, about three years ago in May 2019.  (Administrative Record (R.) 157-65).

He claimed that he became disabled as of April 16, 2018, due to a back injury.  (R. 159, 180).  Over

the next two years, the plaintiff's application was denied at every level of administrative review:

initial, reconsideration, administrative law judge (ALJ), and appeals council.  Plaintiff filed suit

under 42 U.S.C. § 405(g) on June 22, 2021, and the parties consented to my jurisdiction pursuant

to 28 U.S.C. § 636(c) on June 25, 2021. [Dkt. #6].  It is the ALJ's decision that is before the court

for review. *See* 20 C.F.R. §§404.955; 404.981. Plaintiff asks the court to remand the Commissioner's

decision, while the Commissioner seeks an order affirming the decision.

I.

A.

Plaintiff was born in on December 31, 1975.  (R. 159).  He came to the United States from

_____

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of  the
Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and
the first initial of their last name.

Viet Nam. Plaintiff has an excellent work record, working steadily for over twenty-five years until his injury in 2018. (R. 173-74). All that time, he worked in a medical supply warehouse, loading trucks with inventory. He was on his feet all day, lifting and carrying 50 pounds or more. (R. 182). That job ended, however, when he injured his back lifting a medical table.

We've all heard a lot about putting our trust in medical science over the past two years or so, but plaintiff might be excused for being skeptical. Medical science has not been good to him. He has had failed eye surgery and failed back surgery. First, we address the plaintiff's vision problems. In 2016, plaintiff had corneal graft surgery of the left eye which failed. (R. 602-03). As a result, he is essentially blind in his left eye. On June 16, 2019, Dr. Anna Park, an ophthalmologist, noted that plaintiff had a history of penetrating keratoplasties in both eyes and had suffered trauma to the left eye. (R. 647). An ocular examination revealed corrected visual acuity at 20/60 pinholing to 20/50 in the right eye and corrected visual acuity in the left eye of 4/200 pinholing to 5/200. (R. 647). Visual field was limited diffusely in the left eye. (R.647). Slit-lamp examination revealed dermatochalasis of the right upper lid, quiet conjunctiva, and a clear corneal transplant in the right eye and a corneal transplant with diffuse anterior stromal corneal scar and significant corneal edema, deep and quiet anterior chambers in left eye, right peripheral iridectomy inferonasally in the left eye, and aphakia in the left eye. (R. 647). Dr. Park, discussed the possibility of implantation of a secondary intraocular lens in the left eye in the future. (R. 647).

On July 11, 2019, plaintiff underwent a left penetrating keratoplasty. (R. 600-602). Subsequent to the surgery, visual acuity testing revealed 20/50 on the right and 20/200 with correction on the left. (R. 649, 652). On September 26, 2019, a consultative internal medicine examiner noted that plaintiff was blind in the left eye. (R. 491). On October 15, 2019, Dr. Park noted

2

that plaintiff's vision was stable, with visual acuity on the left uncorrected at 20/400 and corrected at 20/200. (R. 499). On January 17, 2020, plaintiff's visual acuity was 20/200 on the left and 20/60 on the right with correction. (R. 515). Results were the same on June 26, 2020. (R. 659).

Then there are plaintiff's back issues. In April 2018, plaintiff injured his back lifting a box at work. He sought treatment for low back pain that radiated to his left leg with Dr. Cavazos, D.C. (R. 723). Examination revealed antalgic gait: limp with a left foot drop. In addition, pain prevented bending and muscle strength was diminished. Dr. Cavazos diagnosed lumbar sprain, right intersegmental pelvis dysfunction/SI sprain, and full left lumbar sciatica. He said that plaintiff had moderate difficulties sitting, standing, bending, and walking, and recommended that plaintiff remain off work until May 2, 2018. (R. 723).

On April 17, 2018, an x-ray of the lumbar spine revealed possible limbus bone L5, degenerative disc disease, and biomechanical alterations. (R. 822). An x-ray of the cervical spine revealed early degenerative changes at C5-6 and C6-7, and biomechanical alterations. (R. 821). An MRI on May 1, 2018, revealed a herniated disc at L5-S1 distorting the thecal sac, a herniated disc at L4-5 distorting the thecal sac and nerve roots, and a bulging disc at L3-4. (R. 823-824).

On May 2, 2018, Dr. Cavazos extended the off work-recommendation to June 30, 2018. (R. 735). Plaintiff had steroid injections on May 21, and June 25, 2018. (R. 841-42). Dr. Cavazos's no work restrictions continued through the summer until plaintiff could have a surgical consultation. (R. 735-761).

Plaintiff had a surgical consult with Dr. Erickson on August 15, 2018. Straight leg raising and Lasegue's signs were positive. The doctor felt plaintiff had nerve root compression at L4-5 and possibly L5-S1. (R. 839). An EMG on August 23, 2018, was normal, but a second test on August

3

24th showed moderate delays at L4-5 and L5-S1. Dr. Erickson felt plaintiff noted that treatment with physical therapy, medications, and injections had all failed, and that plaintiff was a candidate for surgery. (R. 837, 840). Plaintiff would be unable to work until twelve weeks thereafter. (R. 840, 847-48). On October 31, 2018, plaintiff underwent a hemilaminectomy at L4-5 and medial facetectomy and foraminotomies. (R. 825). At surgical follow-up a week later, plaintiff was suffering from constant, burning, left leg pain. Dr. Erickson diagnosed postoperative radiculitis and added Gabapentin to plaintiff's lengthy list of pain medications. (R. 849, 851). Plaintiff's post-operative problems continued through November 2018, when Dr. Erickson said he was "concerned about the level of his postoperative pain." (R. 852). Unfortunately, an MRI scan then revealed a recurrent disc herniation at L5-S1. (R. 832, 854). A diagnosis of lumbar stenosis secondary to disc herniations was added to the diagnoses of L5 sequestered disc, right intersegmental pelvis dysfunction/SI sprain, and full left lumbar sciatica. (R. 769). On September 26, November 7, November 28, 2018 and January 9, 2019, Dr. Erickson, said that plaintiff was unable to work. (R. 848, 850, 853, 855). Dr. Erickson recommended another surgery in January 2019. (R. 854). Not surprisingly given failed eye surgery *and* back surgery, plaintiff declined.

Meanwhile, plaintiff continued his treatments with Dr. Cavazos, multiple times a week and sometimes twice a day. Results were not encouraging. On November 5, 2018, plaintiff had one of his regular visits with Dr. Cavazos. He was still having low back pain radiating down his left leg. Back pain was just 3/10, but leg pain was 10/10. Plaintiff's gait was antalgic, with a limp and a left foot drop with associated atrophy. Straight leg rasing was positive, as was Patrick's sign and cervical compression. Reflexes were reduced by half in the left leg. (R. 420). Dr. Cavazos felt plaintiff would reach maximum medical improvement in January 2019. (R. 420). Plaintiff

continued treating with the doctor at least two times a week and, through the end of the year, results were essentially unchanged. (R. 421-438). Leg pain began to improve in mid-December 2018, although plaintiff still rated it at 9/10. (R. 433).

Exam results remained essentially the same as of January 17, 2019. Plaintiff still had low back pain radiating down his left leg. Back pain was 3/10 and leg pain was 9/10. He had numbness and tingling in his left leg and foot. He was still limping with a left foot drop and associated atrophy. Straight leg raising and other clinical signs were positive, and left leg reflexes were reduced by half. Lumbar flexion was limited to just 35 degrees. Dr. Cavazos had to scrap his thoughts on maximum medical improvement and indicated plaintiff would need another back surgery. (R. 444). Plaintiff, however, chose not to undergo another operation on his spine. (R. 435). As of January 29, 2019, the doctor felt maximum improvement would be reached at the end of March and that plaintiff was disabled from work until then.

Things remained pretty much the same for weeks. (R. 449 *et seq*.). Plaintiff indicated that his condition became worse following surgery. (R. 455). By April 1, 2019, Dr. Cavazos again adjusted his assessment and said plaintiff was still unable to work due to the severity of his condition and plaintiff's inability to sit, stand, or walk. Standing for an hour, sitting for an hour, climbing ten stairs, or lifting ten pounds, all aggravated his injury. (R. 465). Those maximums were reduced by half as the weeks wore on. (R. 468-84)

Little or nothing improved in the Summer of 2019. On visits with Dr. Cavazos through those weeks, examinations and plaintiff's issues were much the same. Plaintiff complained of left side low back pain radiating down the left leg, with numbness in that leg and foot. Pain was constant. He walked with a limp and left foot drop and associated atrophy. Straight leg raising and other clinical

signs were positive. Range of motion was limited to only 35 degrees flexion. Dr. Cavazos said plaintiff was unable to work due to the severity of his condition and inability to sit, stand, or walk. (R. 487).

On September 26, 2019, plaintiff had a consultative examination with Dr. Shah in connection with his application for benefits. (R. 490-495). Vision testing showed plaintiff to be blind in his left eye, and have corrected vision of just 20/70 in his right eye. (R. 491). There was tenderness in the lumber region, and significant limitation of motion: 30 degrees flexion and 10 degrees extension. Straight leg raising was positive at 45 degrees on the right and at 30 degrees on the left. There was ful range of motion in the extremities, but gait was slow, and plaintiff had difficulty heel and toe walking. (R. 492). Reflexes were normal but there was left foot numbness. (R. 493). Dr. Shah interpreted X-rays as revealing degenerative disease at L5-S1 and straightening of the spine indicative of muscle spasm. (R. 495).

On March 2, 2020, plaintiff saw his primary care physician, Dr. Elahi. Plaintiff's problems continued, and had spread to his arms. (R. 694). There was limited range of motion in the left arm. (R. 695). On August 28, 2020, plaintiff reported constant upper right back and right shoulder pain. He had difficulty sleeping at night due to pain. (R. 688). Examination revealed numbness in left leg and both arms to the fingers. (R. 689). On February 13, 2019, Dr. Cavazos stated that plaintiff had sustained a permanent injury which is lifelong and which would result in long-term sequella, including progression of his conditions, including osteoarthritic manifestations. (R. 804).

**B.**

After an administrative hearing at which plaintiff, represented by counsel (and aided by an interpreter), testified, along with a vocational expert, the ALJ determined the plaintiff had the

following severe impairments: vision impairment secondary to left eye trauma, degenerative disc disease of the cervical spine with radiculopathy, and degenerative disc disease of the lumbar spine s/p L4-5 and L5-S1 hemilaminectomies. (R. 15). The ALJ then found plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, focusing on the listings for disorders of the spine (1.04) and visual impairment (2.04). (R. 16). The ALJ then determined that plaintiff could:

> lift up to ten pounds occasionally, five pounds frequently, stand or walk up to two hours per eight hour work day, and sit for up to 6 hours per 8 hour workday, with normal breaks. The [plaintiff] can never crawl or climb ladders, ropes or scaffolds. He can occasionally climb ramps or stairs, balance, stoop, crouch and kneel. The [plaintiff] can frequently reach, handle objects (gross manipulation) and finger (fine manipulations). The [plaintiff] must avoid all exposure to dangerous moving machinery and must avoid all exposure to unprotected heights. The [plaintiff] is limited to jobs that can be performed with no depth perception requirement and no far acuity requirement.

(R. 16).

The ALJ summarized the plaintiff's allegations. He noted that plaintiff alleged he does not drive because of loss of vision in his left eye and limited vision in his right eye but that he renewed his drivers' license three years ago. The ALJ further noted plaintiff's complaints of constant back pain radiating down his legs, and the need for a cane to rise from a seated position. The ALJ also noted plaintiff used over-the-counter medications and Norco for pain, and went so far as to travel to Viet Nam for treatment. (R. 17). The ALJ then determined that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for

the reasons explained in this decision." (R. 17).

The ALJ then discussed the medical record, including the studies revealing herniated discs at L4-5 and L5-S1, and bulging at L3-4. He noted plaintiff underwent a hemilaminectomy at L4-5 and medial facetectomy and foraminotomies on October 31, 2018. A postoperative lumbar MRI revealed that a left subarticular herniation, causing inner margin compromise of the left foramen at L4-L5, appeared improved. It also showed a left central herniation at L5-S1 and disc bulging at L3-4. (R. 17-18). The ALJ also noted studies showing degenerative changes in plaintiff's cervical spine. (R. 18). Finally, the ALJ noted that plaintiff underwent a failed corneal graft/transplant and that, at the time of plaintiff's his physical consultative evaluation on September 26, 2019, Snellen testing showed plaintiff was blind in his left eye and had uncorrected and pinhole vision of 20/70 in the right eye. (R. 19).

As for medical opinions, the ALJ noted the state agency reviewer found plaintiff could perform light work and had difficulty discriminating details of small objects at a distance. The ALJ found the opinion persuasive as to plaintiff's visual impairment but thought plaintiff was more limited physically due to his back and neck impairments. (R. 20). The ALJ rejected the opinion from plaintiff's chiropractor, Dr. Cavazos, that plaintiff was unable to work and had moderate limitations sitting, standing, bending, and walking. The ALJ noted the opinion did not address plaintiff's abilities longitudinally, was not specific as to what "moderate" meant, and conflicted with some medical findings and the fact that plaintiff was able to travel to Viet Nam. (R. 21). The ALJ also rejected the opinion from Dr. Erickson that plaintiff could not work as unsupported. (R. 21).

Next, the ALJ, relying on the testimony of the vocational expert, found that plaintiff could no longer perform his past heavy work, but could perform jobs that existed in significant numbers

in the national economy, such as: stuffer (DOT #.731.685-014, 12,000 jobs); final assembler (DOT 713.687-018 , 15,000 jobs); or waxer (DOT#779.687-038, 6,500 jobs). (R. 21-22). Accordingly, the ALJ found plaintiff not disabled and not entitled to benefits under the Act. (R. 24).

## II.

If the ALJ's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole, *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019), but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017).

The "substantial evidence" standard is a low hurdle to negotiate. *Biestek*, 139 S. Ct. at 1154; *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021). If reasonable minds could differ, the court must defer to the ALJ's weighing of the evidence. *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020). But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an "accurate and logical bridge" between the evidence and the result so as to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015);

9

*O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that "logical bridge." As *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) put it: "we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." [2] *But see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record..."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties, ... No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard: one reader's Mackinac Bridge is another's rickety

---

[2] The term "accurate and logical bridge" was first used by Judge Spottswood Robinson in a non-Social Security context in *Thompson v. Clifford*, 408 F.2d 154 (D.C.Cir. 1968), which said "'Administrative determinations must have a basis in law' and their force depends heavily on the validity of the reasoning in the logical bridge between statute and regulation." 408 F.2d at 167. Judge Posner, first used the phrase in a Social Security context in *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996) and would be the first to acknowledge that it was not meant as a self-defining test or formula. *Cf., United States v. Edwards*, 581 F.3d 604, 608 (7th Cir. 2009)("We recall Holmes's admonition to think things not words...."); *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 990 (7th Cir. 2004).

More recently, the Seventh Circuit, in a Social Security case explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

rope and rotting wood nightmare. But no matter what one's view of the "logical bridge" requirement, no one suggests that the "accurate and logical bridge" must be the equivalent of the Point Neuf. The subjectivity of the requirement makes it difficult for ALJs hoping to write acceptable decisions that stand up to judicial scrutiny when challenged, or when upheld at the district court level and challenged again before the Seventh Circuit.

But, at the same time, the Seventh Circuit has also called the "logical bridge" requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). Indeed, prior to *Sarchet*, the Seventh Circuit "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence . . . in cases in which considerable evidence is presented to counter the agency's position." *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984). Later, in *Stephens v. Heckler*, 766 F.2d 284 (7th Cir. 1985), the court was more explicit when rejecting a plaintiff's argument that an ALJ failed to discuss his complaints of pain:

> We do not have the fetish about findings that Stephens attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).

> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do. . . . This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for

benefits.

*Id.*, at 287 (citations omitted). Or, as the court succinctly put it, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Id.* at 287-88. In this case, however, the ALJ has not.

### III.

This case turned on whether the ALJ believed the plaintiff and his doctors, or not. As it turns out, the ALJ didn't. But in assessing and rejecting the claims plaintiff makes regarding the extent of his pain and limitations and the opinions of the plaintiff's doctors, the ALJ concentrates almost exclusively on two very thin reeds: plaintiff is able to walk, and he flew to Viet Nam for treatment. But, the record, as already summarized, is a tale of bad MRIs, bad x-rays, bad nerve conduction studies, bad clinical exams, and bad vision tests. That's a lot to, if not ignore, push aside because a plaintiff "remains ambulatory" and traveled to Viet Nam for treatment after all manner of Western medical efforts had failed him.

### A.

We begin with the ALJ's assessment of plaintiff's allegations regarding the extent of his symptoms and limitations. "An ALJ's findings concerning the intensity, persistence, and limiting effects of a claimant's symptoms must be explained sufficiently and supported by substantial evidence." *Weber v. Kijakazi*, No. 20-2990, 2021 WL 3671235, at *5 (7th Cir. Aug. 19, 2021); *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011); *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015) (an ALJ must "adequately explain his or her credibility finding by discussing specific reasons" supported by the record). As long as an ALJ gives specific reasons supported by the record, we will not overturn his credibility determination unless it is patently wrong." *Deborah M. v. Saul*,

994 F.3d 785, 789 (7th Cir. 2021); *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015). In this instance, the ALJ's reasoning leaves a lot to be desired.

Of course, the ALJ began the assessment of plaintiff's allegations with the familiar incantation:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(R. 17). The Seventh Circuit has hammered away at this mantra and its predecessor over the years, to no avail. *See, e.g., Mandrell v. Kijakazi*, 25 F.4th 514 (7th Cir. 2022)(". . . the common, but regrettably Delphic, observation . . . ."). It's not even consistent – let alone "entirely consistent" with the Commissioner's own regulations. *See* 20 C.F.R. § 404.1529(a)("In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."). But it's not going away any time soon; certainly not on the word of a magistrate judge.

In any event, an ALJ can get away with the meaningless boilerplate if he goes on to provide well-supported reasons for his rejection of a plaintiff's allegations. *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). In this instance, the ALJ explained:

> While the claimant asserted that he could only stand/walk 15-20 minutes at a time, but that he then needs to rest due to his pain, the record reflects that he has remained ambulatory and without the need for an assistive device. Furthermore, the record is devoid of any treating source opinion regarding physical limitations, let alone support for a more restrictive functional capacity. The claimant further stated that after sitting for a prolonged period, he experiences numbness in his legs. However, the claimant underwent electromyographic testing, which was normal and there are no documented neurologic deficits on exam. Furthermore, the claimant has was able to

13

fly internationally to Vietnam after his lumbar surgery. The claimant also attested to having difficulties going from sitting to standing position and that he needs assistance, such as a cane, to help himself get up, but the record does not substantiate his assertions in this regard. To the contrary, during his physical consultative evaluation on September 26, 2019, the claimant walked into the office without any assistive device and was able to get up from a chair and get on and off the exam table.

(R. 19). Based on the record, the ALJ's reasoning doesn't stand up under examination.

First, it is unclear how the fact that plaintiff "remains ambulatory and without the need for an assistive device" undermines a plaintiff's claim that he can only stand or walk for 15-20 minutes before he had to rest due to pain. Being able to walk without a cane does not mean being able to walk without pain. The ALJ seemed to ignore that, at examination after examination, week after week, it was noted that plaintiff had an antalgic gait and foot drop. In other words, the plaintiff has to drag the front part of his foot when he walks. One supposes that counts as "remain[ing] ambulatory" but it doesn't undermine plaintiff's allegations of back pain or leg pain and numbness. And total incapacitation is not required under the Act.

Second, the ALJ's statement that the record is devoid of any evidence or treating source statement that the plaintiff has any physical limitations is clearly wrong. Plaintiff's treating chiropractor and back surgeon *both* said he was unable to work. *Objective* studies show he has a failed back surgery, bulging and herniated discs in his lumbar spine with radiculopathy, and degenerative arthritis in his cervical spine with radiculopathy. Clinical exams showed significant limitations in range of motion and sensation and impaired gait. Similarly, the ALJ rejected plaintiff's claim that his legs got numb when he sat because the record includes a normal EMG. But the ALJ completely ignored the fact that a study the very next day confirmed nerve delay and exam after exam noted numbness in his left leg or foot. And that was *before* failed back surgery.

The ALJ also rejected plaintiff's claim that he had difficulty going from a sitting to standing position because at his consultative exam, he exhibited no difficulty getting up from a chair and exam table. But, he also was noted to walk gingerly, have discomfort lying down and getting up. There was also positive straight leg raising bilaterally and significant limitation of range of motion. If plaintiff's range of motion in his lower back is just 30 degrees flexion and just 10 degrees extension, it certainly stands to reason that would have difficulty getting from a sitting to standing position.

Finally, the ALJ also took plaintiff to task for claiming he could not sit for very long without pain and numbness but still being able to fly to Viet Nam and back. Supposedly, plaintiff went to Viet Nam for other treatments when medication, physical therapy, injections, and surgery had all failed here in the West. It wasn't just a vacation. *Cf. Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014)(vacation trip did not undermine the credibility of plaintiff's complaints). Moreover, there is no information regarding plaintiff's fight, how often he had to change positions or get up and move about the cabin. The ALJ didn't follow up on this Viet Nam theory. *See Murphy*, 759 F.3d at 817 ("Given the limited information available on the record, such a vacation as described by Murphy would not be inconsistent with her symptoms to the point where her credibility would be diminished. Once again, we cannot assess the validity of the ALJ's determination because the record is devoid of information that might support her assessment and the ALJ did not ask follow-up questions that might prove insightful."). Indeed, this points up a deficit in the ALJ's reasoning. The plaintiff's quest for relief through multiple types of treatment should serve to bolster his credibility rather than detract from it. *See, e.g., Israel v. Colvin*, 840 F.3d 432, 441 (7th Cir. 2016)("[Plaintiff] has a lengthy medical history that begins with a specific injury, continues through a failed surgery resulting

in a diagnosis consistent with persistent pain . . . (a diagnosis affirmed by . . . the State's own doctor), and proceeds through a lengthy series of failed attempts to control [plaintiff's] pain. [Plaintiff] has undergone painful and risky procedures in attempts to alleviate his pain, actions that would seem to support the credibility of his claims regarding the severity of his pain."); *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (noting the improbability that a claimant would have undergone extensive pain-treatment procedures that included not only heavy doses of strong drugs but also surgery "merely in order to strengthen the credibility of her complaints of pain and so increase her chances of obtaining disability benefits").

Plaintiff is not a Supplemental Security Income applicant with little or no work record and little or no experience of earning income. He has a stellar work history and was doing whatever he could to get back to work. Such an individual is unlikely to go through the trouble of multiple chiropractic treatments a week, sometimes twice a day, as part of some ruse to qualify for the substantial pay cut disability benefits would represent. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017)("A positive work history makes a claimant more credible, . . . and a desire to resume work similarly makes a claimant more credible, not less"). Overall, the ALJ failed to build an adequate logical bridge from the evidence to his decision needed to reject the plaintiff's allegations.

### B.

There are similar problems with the ALJ's treatment of the opinions from the plaintiff's treating doctors. Because plaintiff filed his claim after March 27, 2017, the Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, revised 82 Fed. Reg. 15132; see also 81 Fed. Reg. 62,560 (discussing proposed changes), apply. *See Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019). ALJs no longer must "defer or give any specific evidentiary weight,

including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a plaintiff's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a); see also 81 Fed. Reg. 62,560, 62,574 (discussing the proposed rule changes) ("In addition to proposing to use the term 'persuasive' instead of 'weight' for medical opinions in 20 CFR 404.1520c and 416.920c, we also propose to use the term 'consider' instead of 'weigh' in 20 CFR 404.1520b and 416.920b.").

But, as before, "supportability" and "consistency" remain hallmarks of assessing medical opinions:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. §§ 404.1520c(c), 416.920c(c). Although ALJs must consider a number of additional factors, they need only explain how they considered supportability and consistency. 20 C.F.R. § 404.1520c(b)(2), 416.920c(b)(2).

Here, the ALJ said he did "not find Dr. Cavazos' opinions to be persuasive." The ALJ dismissed Dr. Cavazos' early assessments because they "were completed shortly after the claimant reported back pain secondary to a work" and "concerned the [plaintiff's] functioning over a specified and brief period" as opposed to the plaintiff's "longitudinal physical functional ability." (R. 21). As for Dr. Cavazos's ultimate opinion that plaintiff was "unable to work," the ALJ said the doctor did not "provide a clinical explanation to support his opinion or why it had changed from his

previous opinions" and – again focusing on the plaintiff's ability to walk gingerly with a drop foot as though it were an unsurpassed feat of athleticism – said that it was contrary to "documented physical examinations reveal that the claimant has been ambulatory, and has been able to go from sitting to standing position without noted difficulties in doing so." Finally, the plaintiff's quest for further treatment continued to haunt the ALJ, as he again pointed out that after Dr. Cavazos rendered his opinion, "the [plaintiff] was able to travel internationally to and from Vietnam demonstrating that he could sit for a prolonged period." (R. 21).

The ALJ's reasoning has a bit of the old forest and trees problem. Yes, Dr. Cavazos issued a series of temporary disability opinions. As his treatments, medications, epidural steroid injections, and surgery all failed, those temporary opinions had to been changed and extended, month after month. That record of treatment, exam results, and revised opinions presents nothing if not a "longitudinal" picture of plaintiff's physical capacity, or lack thereof.

Plaintiff injured his back in April 2018. He began treatments with Dr. Cavazos thereafter, and the doctor began issuing temporary opinions and revising them as plaintiff's condition failed to improve. Plaintiff then went for a surgery consult and Dr. Erickson – who also opined plaintiff couldn't work – and the doctor performed surgery in October 2018. Obviously, plaintiff couldn't work while recovering from that procedure, and Dr. Erickson said so, repeatedly. But plaintiff's condition didn't improve, and objective testing confirmed a recurrent herniated disc and a failed surgery. Dr. Erickson suggested another try in January 2019, but plaintiff – understandably, given his experiences – demurred. Plaintiff returned to Dr. Cavazos, who continued to record examination findings showing no improvement and had to continue revising and extending his estimate for when plaintiff would be able to work. Notably, this went on through the summer of 2019. By focusing

on each temporary opinion in isolation, the ALJ missed a "longitudinal" disability opinion that stretched well beyond the required twelve months. 42 U.S.C. § 423(d)(1)(A); *Stepp v. Colvin*, 795 F.3d 711, 719 (7th Cir. 2015)(plaintiff "is required to demonstrate that []he suffers from a long-term disability, which must last or be expected to last at least twelve months.").

Those same examination reports – we won't summarize them yet again – provide support for Dr. Cavazos's – and Dr. Erickson's – opinions. It seems the ALJ ignored them, or perhaps wanted the doctor to summarize them in one place; it's difficult to say. But, it is mind-boggling that, given those months and months of reports, the ALJ could possibly say that Dr. Cavazos failed to "provide a clinical explanation to support his opinion or why it had changed from his previous opinions . . . ." What has already been said about the ALJ's main problem with the plaintiff's application – the trip to Viet Nam for treatment – will not be repeated. The ALJ, again, failed to build the required "logical bridge" from the medical evidence to his conclusion.

## C.

So, while this case must be remanded to the Commissioner, it is worthwhile to briefly address a couple of plaintiff's arguments regarding the ALJ's consideration of his vision impairment. Plaintiff has a number of little criticisms of the ALJ's thoughts on his vision impairment, but, for practical purposes, they boil down to two contentions: the ALJ was wrong to accommodate plaintiff's left-eye blindness by a restriction to work that did not require depth perception or far vision. [Dkt. #13, at 9-10]; and the ALJ was wrong to accept vocational testimony that jobs were available that plaintiff could perform despite his vision impairment.

The ALJ's determination that plaintiff was restricted to work that did not require depth perception or far vision was based on the expert opinion of state agency reviewer, Dr. Galle. (R.

20).  The state agency reviewer's opinion provides substantial evidence to support the ALJ's RFC. *See, e.g., Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021); *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019); *Baldwin v. Berryhill*, 746 F. App'x 580, 584 (7th Cir. 2018).  This is especially the case where, as here, plaintiff points to no medical opinion or evidence supporting a different set of vision restrictions.  Plaintiff points to no medical evidence to show he cannot do these things, and it was up to him to do so. *See, e.g., Gedatus*, 994 F.3d at 905 ("Besides, [plaintiff] has not pointed to any medical opinion or evidence to show any tremors caused any specific limitations."); *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019)("[E]ven if the ALJ's RFC assessment were flawed, any error was harmless" because "[i]t is unclear what kinds of work restrictions might address [claimant's] limitations ... because he hypothesizes none" and "the medical record does not support any.").  Plaintiff suggests that it was up to the ALJ to find evidence that he could not perform work that did not require depth perception or far vision, but plaintiff has been represented by counsel since at least May of 2019.  As such, the plaintiff is presumed to have made her best case for benefits. *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017).

As for the vocational expert's testimony, the plaintiff focuses exclusively on whether he can perform a job called "waxer," which involves brushing a coat of wax on glass speedometer and radio dials, leaving stenciled numbers and figures free for etching.  It's not clear from plaintiff's brief why brushing a coat over wax over a dial with stencils on it requires depth perception – an individual is not doing the etching of the small numbers, after all.   As for whether that job actually exists – a point counsel raised at the hearing – the vocational expert testified that it did, based on use of OccuBrowse and the Occupational Employment and Wage Statistics reports.  (R. 64-66).  But, in any event, the other two jobs not addressed by plaintiff amount to 27,000 positions.  As such, there

are a significant number of jobs. *See Mitchell v. Kijakazi*, ––– F.4th ––––, 2021 WL 3086194, at *3 (7th Cir. 2021); *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009); *Dorothy B. v. Berryhill*, 2019 WL 2325998, at *7 (N.D. Ill. 2019) (17,700 jobs "a significant number of jobs in the national economy"); *Iversen v. Berryhill*, 2017 WL 1848478, at *5 (N.D. Ill. 2017)(finding the job of waxer for which 1,000 waxer positions existed in Illinois and 30,000 existed in the nation a job that alone sufficed to support the ALJ's Step Five determination).

21

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for reversal [Dkt. #13] is granted, the defendant's motion for affirmance [Dkt. #14] is denied. This case is remanded to the Commissioner for further proceedings consistent with this Opinion.

**ENTERED:** _____

**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 6/29/22